***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and arguments before the Full Commission. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications, the Opinion and Award of Deputy Commissioner Stephenson.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The date of injury which is the subject of this claim is March 22, 2005.
2. On all relevant dates, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. On all relevant dates, an employer-employee relationship existed between plaintiff and defendant-employer.
4. On all relevant dates, defendant-employer employed three or more employees.
5. The carrier of workers' compensation insurance in North Carolina for defendant-employer was First Comp Insurance Company.
6. On all relevant dates, plaintiff's average weekly wage was $458.98, which yields a compensation rate of $306.00.
7. The parties participated in mediated settlement conferences on January 31, 2007 and August 8, 2007. Defendants have paid the entire mediation fees for both dates in the amount totaling $875.00. Pursuant to Rule 7 (c) of the Rules for Mediated Settlement and Neutral Evaluation Conferences of the North Carolina Industrial Commission, defendants are entitled to a credit in the amount of $437.50 for payment of plaintiff's share of the mediation costs, and defendants may withhold funds from any award for this purpose.
8. The parties stipulated and agreed during the hearing with the Deputy Commissioner that the following documents are authentic business records of the persons or businesses identified in connection with such records, and the same may be received into evidence without further authentication, but subject to the right of either side to take testimony from the persons so identified in connection with the records:
 a. All Industrial Commission forms and filings *Page 3 
 b. All related medical records
 c. All discovery exchanged between the parties
 d. Nurse case manager reports
9. The issues before the Commission are to what additional benefits plaintiff is entitled and whether the Commission should set aside the Form 60, Employer's Admission of Employee's Right to Compensation.
 ***********
Based upon all of the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 41 years old. Plaintiff has a seventh grade education.
2. Plaintiff began employment with defendant-employer, The Market Basket, in February 2000. Plaintiff reported to defendant-employer that she slipped and fell on ice in a drink cooler on March 22, 2005, and sustained an injury to her back and right shoulder. On that date, plaintiff was the store manager and her direct supervisor was Kent Caudle.
3. On April 6, 2005, plaintiff filed a Form 18 reporting injuries to her right shoulder and back due to her fall on March 22, 2005.
4. Although there were no witnesses to plaintiff's fall, her claim was accepted by defendant-employer as compensable and a Form 60 was filed on May 11, 2005 and approved by the Commission on September 20, 2005.
5. Prior to March 22, 2005, plaintiff had a significant history of a pre-existing fibromyalgia as well as polyathralgia and chronic pain. *Page 4 
6. Prior to plaintiff's alleged work fall on March 22, 2005, she was evaluated by Dr. Bob Wodecki on August 12, 2004. Plaintiff's chief complaints included joint pains all over, pain involving her hands and feet, and pain throughout her whole body. On August 12, 2004, plaintiff reported that she had previously used pain medications including Hydrocodone, Vicodin, Neurotin and Ultram for treatment of her chronic pain and fibromyalgia condition.
7. Dr. Wodecki diagnosed plaintiff with fibromyalgia as well as polyarthralgia, which indicates aches and pains in more than one joint. After examining plaintiff, Dr. Wodecki opined that plaintiff could continue with full duty work.
8. Dr. Wodecki's evaluation of plaintiff on January 12, 2005, again prior to the alleged fall of March 22, 2005, revealed that plaintiff had pain in her lower back and trapezius shoulder area.
9. On March 16, 2005, six days prior to her work related injury, plaintiff described her pain to Dr. Wodecki as unbearable and continuous. Plaintiff indicated that she had pain all over her body, which Dr. Wodecki admitted was consistent with all plaintiff's previous evaluations since August of 2004. On March 16, 2005, plaintiff indicated to Dr. Wodecki that her pain level was ten out of ten.
10. Dr. Wodecki stated that when a patient consistently described their pain on an average of eight out of ten, it raises concerns of drug seeking behavior. Plaintiff rated her pain as an eight out of ten on average. Dr. Wodecki did not provide work restrictions and was not concerned that plaintiff's job duties would exacerbate her condition, despite the pain plaintiff reported. *Page 5 
11. Plaintiff was evaluated by other pain specialists prior to the time that she presented to Dr. Wodecki. Dr. Wodecki was especially scrupulous with the medications he prescribed to plaintiff, due to her history of narcotic use.
12. On March 22, 2005, after plaintiff reported the injury to defendant-employer, she presented to the emergency room of Wilkes Regional Hospital. Plaintiff's lumbar spine x-ray revealed degenerative disease without evidence of acute injury and she was diagnosed with contusion to her back and myofascial lumbar strain.
13. On March 24, 2005, plaintiff was seen by Dr. Joel Inman, board certified family physician. Dr. Inman opined that plaintiff sustained a contusion of the right scapula and a low back muscle strain, as a result of her fall on March 22, 2005.
14. Dr. Inman provided work restrictions of no lifting over ten pounds and no excessive bending or ambulation. These restrictions remained unchanged throughout his treatment of plaintiff. Plaintiff's x-ray of her right shoulder was normal and revealed no evidence of acute injury. Plaintiff did not inform Dr. Inman that she was previously diagnosed with fibromyalgia and suffered from chronic pain.
15. On May 17, 2005, plaintiff was evaluated by Dr. Sam Bhagia, who noted that plaintiff showed excessive responses throughout the evaluation. X-rays of plaintiff's shoulder showed no evidence of fracture. On May 25, 2005, plaintiff underwent an MRI of her right shoulder and lumbar spine, which were normal and showed no evidence of a rotator cuff tear.
16. Regarding the vertebral fractures indicated on the x-ray of plaintiff's lumbar spine, Dr. Bhagia testified that the fractures appeared to be chronic fractures which predated her work injury. Dr. Bhagia further noted that the vertebral fractures could be anywhere from a year or two to 20 or 30 years old; however, it was difficult to give an exact time line. Dr. Bhagia *Page 6 
stated that there was no increased inflammation of the disc area to suggest that it was an acute injury, in looking at the disc bulge indicated on the MRI of plaintiff's lumbar spine. Dr. Bhagia concluded and the Commission finds that the disc bulge was associated with an injury which occurred prior to plaintiff's injury on March 22, 2005.
17. On June 21, 2005, Dr. Bhagia diagnosed plaintiff with a lumbar sprain/strain, lumbar degenerative disc disease at L2-L3 and myofascial pain. Dr. Bhagia found no objective evidence to corroborate plaintiff's subjective pain symptoms, and strongly recommended that she return to work. Dr. Bhagia assigned restrictions of no lifting over 20 pounds and avoiding excessive bending and twisting of her lumbar spine.
18. Plaintiff never reported to Dr. Bhagia that she was previously diagnosed with fibromyalgia, that she had chronic pain all over, or that she had been diagnosed with several different chronic pain disorders. Dr. Bhagia stated that he would have found plaintiff's pre-existing conditions significant when he evaluated her.
19. The greater weight of the evidence indicates that when plaintiff was evaluated by Dr. Bhagia on May 17, 2005, she had recovered from the compensable injury by accident.
20. Plaintiff was first evaluated by Dr. Michael Getter on September 1, 2005 for low back pain and shoulder pain. With regard to plaintiff's MRI, Dr. Getter did not find specific pathology to account for her shoulder pain. Dr. Getter noted that plaintiff had a midline disc herniation at the L2-3 level and disc degeneration, which he believed were present prior to her injury on March 22, 2005. Dr. Getter also noted that the vertebral fractures were old and clearly not acute. *Page 7 
21. Although Dr. Getter wrote plaintiff out of work, he admitted that, with appropriate restrictions, she could perform some type of activity. Dr. Getter assigned a 10% rating to plaintiff's back.
22. Dr. Getter indicated that there was no way for him to render an opinion regarding the degree, if any, that plaintiff aggravated or exacerbated her pre-existing condition, as a result of her accident on March 22, 2005.
23. Dr. Getter stated, and the Full Commission finds, that plaintiff's fall on March 22, 2005 did not cause plaintiff's degeneration or aggravate or accelerate her pre-existing disc herniation. Dr. Getter also indicated that there was no way to tell what caused the midline herniation that was detected on plaintiff's MRI.
24. On June 30, 2005, plaintiff returned to Dr. Wodecki who diagnosed lower back compression fractures, fibromyalgia and lower back pain. Dr. Wodecki could not express an opinion regarding the age of plaintiff's vertebral fractures. On June 30, 2005, plaintiff described her pain as ten out of ten, the best at eight and an average of eight, which was consistent with her complaints prior to March 22, 2005.
25. Dr. Wodecki agreed that, assuming that plaintiff's MRI of her shoulder is normal and that her compression fractures are old injuries and not acute, then plaintiff should be able to work at a medium physical demand level.
26. During the hearing before the Deputy Commissioner, plaintiff stated that she had great health for the past 25 years. Plaintiff later admitted, on cross examination, that she had struggled with fibromyalgia for the past 20 years. *Page 8 
27. Although plaintiff stated she had never had back pain prior to her fall on March 22, 2005, she admitted that her MRI and x-rays revealed evidence of old injuries to her lumbar spine.
28. Plaintiff also admitted that Dr. Bhagia strongly recommended that she return to work. However, plaintiff has not sought alternate employment.
29. The greater weight of the evidence shows plaintiff sustained only a minor exacerbation of medical problems, all of which she had prior to her March 22, 2005 accident. Defendants were not aware of plaintiff's prior medical problems when they accepted the claim with a Form 60. The greater weight of the medical evidence shows that plaintiff returned to her pre-injury physical condition no later than May 17, 2005, and any medical problems after that date are not causally related to the fall on March 22, 2005.
30. Plaintiff contended that after March 22, 2005, her employer required her to exceed her work restrictions. Kent Caudle, plaintiff's direct supervisor, stated that plaintiff's normal job duties did not require plaintiff to work outside her restrictions and to the extent that she did so, she did so voluntarily. Specifically, Mr. Caudle also indicated that the job duties of which plaintiff complained could have been done by other workers in the store.
31. Mr. Caudle also confirmed that plaintiff was reprimanded for falsifying her time card and she was terminated for improperly using a money gram for her personal use that belonged to the store. Plaintiff was subsequently re-hired by defendant-employer and worked until taken out of work by Dr. Getter.
32. Ilene Brooks appeared at the hearing before the Deputy Commissioner pursuant to a subpoena. Ms. Brooks stated that plaintiff had hired her and was her supervisor for approximately one year in which they worked together for defendant-employer. Ms. Brooks was *Page 9 
employed by defendant-employer between 2005 and 2007. At the time of the hearing Ms. Brooks was no longer working for defendant-employer, but was seeking Social Security Disability benefits and therefore was not in a position to seek re-employment with defendant-employer.
33. Ms. Brooks indicated she and plaintiff had been friends outside the work environment, along with being co-workers. Ms. Brooks stated that in 2007, approximately two years after the injury by accident, plaintiff told her that she injured herself while lifting an air compressor and that she reported the injury as a work-related injury.
34. Ms. Brooks also stated that she observed plaintiff assist Ms. Brooks' husband in moving a couch and love seat, as well as load and unload boxes when plaintiff was moving into another residence in 2007. Ms. Brooks observed plaintiff pick up her grandchildren, who weighed approximately 28 and 50 pounds, on multiple occasions. Ms. Brooks and plaintiff made frequent trips to Statesville and plaintiff drove the entire distance.
35. In rebuttal testimony, plaintiff contended that although she does own an air compressor, she is unable to move it, as it is too heavy. Plaintiff also stated that she and Ms. Brooks are no longer friends. Plaintiff contended that she did not pick up or help move a couch and love seat and she is not able to pick up her grandchildren.
36. Plaintiff's boyfriend, David Bentley Hayes, also indicated that plaintiff has never moved her air compressor. Mr. Hayes confirmed that Ms. Brooks and her husband were present when plaintiff was moving to her new residence; however, he contended that he and Ms. Brooks' husband moved the couch and loveseat. Mr. Hayes originally stated that he was plaintiff's friend, but later admitted that he is her boyfriend. Mr. Hayes also admitted that he testified at the hearing due to his concern and affection for plaintiff. *Page 10 
37. The Full Commission finds that the testimony of Ms. Brooks is more credible than the testimony of plaintiff or Mr. Hayes. However, plaintiff's statement concerning falsifying a work-related injury was made to Ms. Brooks two years after plaintiff filed this claim. According to Ms. Brooks' testimony, plaintiff's statement did not identify the particular claim involved by specifying the type of injury reported, the approximate date of the injury, or any other details about such a claim. Therefore, the Full Commission finds that there is insufficient evidence on which to set aside the Form 60 filed in this matter on the basis of fraud.
 ***********
Based upon the above stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On March 22, 2005, plaintiff sustained a compensable injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2 (6).
2. As the result of the compensable injury by accident, plaintiff was disabled and was entitled to payment by defendants of temporary total disability compensation at the rate of $306.00 per week from March 22, 2005 through May 17, 2005. N.C. Gen. Stat. § 97-29.
3. Any disability plaintiff sustained after May 17, 2005 was not causally related to the fall on March 22, 2005. Defendants are not liable to plaintiff for any indemnity compensation or medical treatment after May 17, 2005 and are entitled to a credit for any compensation paid after that date, which shall be credited to defendants toward any future award.
4. An agreement for the payment of compensation, when approved by the Commission, is binding on the parties. N.C. Gen. Stat. § 97-82(a); Pruitt v. KnightPublishing Co., 289 N.C. 254, 221 S.E.2d 355 (1976). Absent a showing of fraud, misrepresentation, *Page 11 
undue influence or mutual mistake, the Commission may not set aside an agreement to pay compensation. N.C. Gen. Stat. § 97-17(a). The party seeking to set aside the agreement must prove to the satisfaction of the Commission that there has been error due to one or more of these factors. Id.
5. In the case before us, the evidence of fraud on the part of plaintiff was a vague statement made to Ms. Brooks and some efforts by plaintiff to move some furniture. Both of these incidents occurred two years after the injury which is the subject of this claim. Therefore, defendants have not met their burden to show that the Form 60 should be set aside for fraud and the Form 60 is binding on the parties. Pruitt v. Knight Publishing Co.,supra.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff is entitled to temporary total disability compensation from the date of her compensable injury, March 22, 2005, through May 17, 2005. Plaintiff has already received all benefits to which she is entitled as a result of her compensable fall of March 22, 2005.
2. Plaintiff's claim for additional indemnity or medical compensation beyond May 17, 2005 is DENIED.
3. Defendants shall receive a credit for all compensation paid to plaintiff after May 17, 2005, which shall be applied to any future compensation payable to plaintiff. However, if there is any difference between the weekly rate paid by defendants and the correct compensation rate of $306.00, defendants' credit shall be reduced by that amount. Defendants shall also receive a credit for plaintiff's share of the mediation costs. *Page 12 
4. Defendants' motion to set aside the Form 60 is DENIED.
5. Defendants shall pay the costs.
This the 26th day of March 2010.
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER *Page 13